Argued 30 July, decided 22 October, 1907.

### ROACH'S ESTATE.

92 Pac. 118.

EXECUTORS—RELATION OF TO LEGATEES AND HEIRS.

1. In a general sense the relation of an executor to the legatees and others entitled to the estate is one of trusteeship.

TESTAMENTARY TRUSTS—WHAT COURTS HAVE JURISDICTION.

2. The circuit courts have jurisdiction of the subject matter of trusts created by wills which impose on executors the duties of testamentary trustees, to the exclusion entirely of probate courts.

RELATIVE RIGHTS OF EXECUTORS AND TRUSTEES.

3. Where an executor has lawfully secured possession of any property of his testator, he has the exclusive control over it until he has been discharged, and any interference therewith by another will be an intrusion on the rights of the probate court.

TERMINATION OF DUTIES AS EXECUTOR BEFORE BECOMING TRUSTEE.

4. Where an executor has been also appointed testamentary trustee, he should not assume to act in the latter capacity until he has settled his accounts as executor and been discharged.

EXECUTORS—EVIDENCE OF ASSUMING TRUSTEESHIP.

5. The evidence of a change of position from executorship to trusteeship should be some affirmative action, such as securing a release from the probate court and filing a trustee's bond.  A mere ceasing to file reports as executor will not be sufficient.

JURISDICTION OF COUNTY COURT TO COMPEL REPORT BY EXECUTOR.

6. Where an executor has admitted the jurisdiction of the county court by securing from it a confirmation of his appointment as executor, and recognized its authority by making to it semi-annual reports as required by statute, the county court is empowered to compel a final settlement, nothing having been done to defeat that right.

JURISDICTION OF CIRCUIT COURTS ON APPEALS IN PROBATE MATTERS.

7. Under Sections 555 and 558, Subd. 3, B. & C. Comp., providing that on appeal from the county court the proceedings shall be tried anew in the circuit court, and that the circuit court may give a final decree in the cause, a probate proceeding appealed from the county court is to be tried anew in the circuit court on all questions presented by a transcript of the entire record, the provision of section 556, that the appellate court may modify a decree "in the respect mentioned in the notice," being applicable only to appeals from circuit courts to the supreme court.

Under Section 1100, B. & C. Comp., providing that the procedure in the county court when exercising probate jurisdiction shall be in the nature of a suit in equity, the county court is not technically a court of equity, and the rule governing appeals from parts of decrees in circuit courts do not govern appeals from final decisions of the county courts in the settlement of estates.

EXECUTORS—JURISDICTION OVER OBJECTIONS TO ACCOUNTS.

8. Under Sections 1202 and 1203, B. & C. Comp., authorizing the filing of objections to the final account of an executor, "specifying the particulars of such objections," etc., the court on hearing objections to such final account is limited to the particular specifications set forth in the objections.

FINAL ACCOUNT—ITEMS PRACTICALLY CONCEDED AS ERROR.

9. Where an executor says he has no personal recollection of paying an item credited to his account, and the payee testifies that he did not receive it, the credit is properly disallowed.

SAME—INTEREST ON REJECTED CREDIT.

10. Where the objection to the allowance of a credit in an executor's final account does not require him to account for interest on the amount thereof, and there is no declaration in the exception of any sum due as compensation for the use of money on account of the item, interest should not be granted on the amount of the credit on the same being disallowed.

SAME—UNCHALLENGED ITEMS—REJECTION.

11. Unchallenged items on the credit side of an executor's final account cannot be rejected.

EXECUTORS—DUTY IN MANAGEMENT OF ESTATE.

12. An executor investing trust funds is not an insurer, but must exercise that degree of discretion which an intelligent person of ordinary prudence would observe in the management of his own affairs.

FINAL ACCOUNT—VALUE OF TESTIMONY OF INTERESTED PARTY.

13. On the issue whether an executor exercised proper care in loaning trust funds on security of a mortgage, the borrower is competent to testify, but his opinion cannot be considered the best evidence, for he is an interested person.

EXECUTORS—SETTLEMENT OF ACCOUNTS—BURDEN OF PROOF.

14. Where an executor's final account is properly challenged, the burden of proving the truth of an item or the reasonableness of a credit objected to is on him.

SAME—INVESTMENTS—LOSS—LIABILITY.

15. An executor loaned $2,000 of trust funds, taking as security therefor a mortgage on 160 acres of unimproved land and 80 acres of alleged timber land, remote from markets and carrying only a small number of commercial trees. At a foreclosure sale, the tracts were sold at a sum insufficient to pay the debt. The borrower testified that he considered the loan adequately secured, but no other person so stated. *Held* sufficient to show want of proper care on the part of the executor in making the investment, rendering him personally liable for the loss.

SAME—LOAN ON INSUFFICIENT SECURITY.

16. A purchaser of land for $5,000 paid two-thirds and gave two notes secured by a mortgage on the premises. An executor purchased with trust funds both notes. The mortgage was foreclosed, and a deficiency resulted. When the executor bought the first note, no depreciation in the value of the property had occurred, but at the time he purchased the second note the value of the premises had declined. The land had only a speculative value, was unimproved, and by reason of its situation had no real worth as a basis for security. *Held*, that the executor was personally liable for the loss.

SAME—SECOND MORTGAGE SECURITY.

17. Where a loss occurs to an estate by reason of a loan on a second mortgage security, the executor is personally liable for the loss.

SAME—ITEM UNDER CONSIDERATION.

18. An executor loaned money and took a second mortgage on lots and a mortgage on a 10-acre tract. The lots satisfied only the first mortgage. The executor took no steps to foreclose the mortgage on the 10-acre tract. No testimony of its value was given. *Held,* that the executor was properly chargeable with the loss. he failing to sustain the burden of proving the adequacy of the security.

SAME—DUTY TO AVOID STATUTE OF LIMITATIONS.

19. An executor failing to foreclose a mortgage taken as security for a loan of trust funds and allowing limitations to bar a recovery is personally liable for the loss to the estate.

SAME—ITEMS NOT OBJECTED TO.

20. In settling an executor's accounts items not objected to should not be reviewed.

SAME—LIABILITY FOR LOANS MADE WITHOUT SECURITY.

21. The loss of trust funds loaned without any security or on manifestly inadequate security is negligence, and an executor is personally liable for a failure to obtain a repayment of the moneys loaned, whether the loan was made before or after the passage of an act prescribing the manner of investing funds by a trustee, because such a proceeding does not disclose the prudence ordinarily exercised by intelligent men in their affairs.

FINAL ACCOUNT—REPORT AND OBJECTIONS THERETO.

22. A decree requiring an executor in the settlement of his final account to account for sums found to be due the estate must be based on his final account, the objections thereto and the proofs.

FINAL ACCOUNT—RIGHT TO FILE AMENDED OR FURTHER OBJECTIONS.

23. Legatees objecting to the final account of an executor are not limited to their original objections, but they may file additional or amended objections, or modify their demand, to correspond with the testimony.

SAME—INVESTMENTS—LOSSES—LIABILITY.

24. An executor bought a note for $800, secured by a mortgage, and purchased the premises at foreclosure, and, after having received rents, sold the same for $900. The executor's counsel offered a settlement on the basis that the sale of the premises was made to the executor in his own name, so that he should be personally charged with the money expended therefor and interest thereon. The court charged the executor with the sum paid for the note, the interest thereon, the taxes paid, and expenses incurred on account of the property, and credited him with the sum received on the resale and the rent. *Held,* that the conclusion of the court should not be disturbed.

SAME—COMPENSATION—ALLOWANCE.

25. Where an executor did not apply to the county court for advice in the management of the estate, and for more than eight years made no report of his dealings, though required by B. & C. Comp. § 1199, to account semi-annually, the court properly denied him any extra compensation, office rent or attorney's fees.

SAME—OBJECTIONS NOT SPECIFIED.

26. Where the objections to the final account of an executor do not assign grounds urged on appeal, a denial of the relief sought by the objectors is not erroneous.

EXECUTORS—ACCOUNTING—TERMS OF DECREE.

27. Where an executor is held personally liable for losses from his investments of trust funds on insufficient security, and he has obtained for the estate title to the property taken as security, the legatees must quit claim to him their claim to such property as a condition precedent to his paying the losses.

SAME CONTINUED.

28. Where an executor, in satisfaction of mortgage debts, has accepted conveyances of the incumbered land and also foreclosed mortgages, and, on the sale, has taken deeds therefor to himself as executor, he must, as a condition precedent to his discharge and the release of his bondsmen, convey the premises to the legatees as tenants in common.

COSTS IN EQUITY—APPEAL.

29. The Supreme Court may, in its discretion, assess the costs and disbursements of an appeal against the successful party, under Section 566, B. & C. Comp.

From Multnomah: JOHN B. CLELAND, Judge.

Statement by MR. JUSTICE MOORE.

This proceeding in the matter of the Estate of Caroline H. Roach, Deceased, was instituted in the County Court of Multnomah County by Eva M. Roach and others, legatees, to compel James Humphrey, an executor, to render a final account. Caroline H. Roach, by her last will, executed April 7, 1888, gave to her husband, B. H. Roach, the sum of $10, and devised and bequeathed the remainder of her property equally to her children. The will contains, *inter alia*, the following clauses:

"I desire and direct my executors to keep said property until my said children shall arrive at the age of majority, unless in their judgment it would be for the best interest of my said children to sell such portion of the real estate as shall not be yielding any rental, and put the proceeds at interest. And I further authorize and direct my said executors to use such of my said property or the income thereof as shall be necessary to support, maintain and educate my said children."

Mrs. Roach died December 12, 1892, leaving her husband and the following named children: George H., Eva M. and Grace A. Roach. Her will was admitted to probate in that county, and her brother, James Humphrey, who was named in the testament as one of the executors thereof, was appointed and duly qualified for the trust. He filed an inventory of the property of the estate, which consisted of money in the sum of $1,493.67, promissory notes of the face value of $24,175.75,

which were appraised at $19,671, certain real property in the
City of Portland, which had been the family home, and house-
hold goods therein, valued at $6,000 and $300, respectively,
and six shares of the capital stock of the Elkhorn Mountain
Gold Mining Company, considered worthless—thus making the
entire appraisement $27,464.67. The possession of the home
was retained by B. H. Roach as tenant by the courtesy, and the
household goods were, by order of the county court, delivered
to the children, who hereafter will be designated as the leg-
atees. The executor made regular semiannual reports of the
money which he received and disbursed, until October 14, 1895,
when, having paid all the debts of the estate and the bequest
to B. H. Roach, he made no further statements to the county
court of his dealings with the property until December 22,
1903, at which time he filed a final account, pursuant to a
citation issued when the youngest child attained her majority.
The several reports show that the legatees have received from
the executor, on account of their support, maintenance and
education, the sum of $11,895.50. Humphrey claimed in the
final report, in addition to the compensation prescribed by law,
a further remuneration of $50 a month during the 11 years he
discharged the trust, or $6,600, for special duties performed
$1,175, and for office rent $818, making a total of $9,193, be-
sides attorney's fees for probating the will $50, and for pre-
paring the final account $100. Objections to certain items con-
tained in the final account were filed by the legatees, whereupon
the executor filed a supplemental and explanatory account,
which showed that he had on hand for distribution $9,575.61
in money, besides certain real and personal property. A stipu-
lation was entered into by the parties, to the effect that the
explanatory statements contained in the supplemental account
correctly detailed the facts responsive to the objections inter-
posed, except in certain particulars, the right to controvert
which was reserved by the legatees. The executor thereupon
asked for a further allowance of $750, with which to compen-
sate the attorneys who had been employed to resist the objec-

tions. The cause was tried by the county court, and from the testimony taken it was decreed that the executor should be granted a further credit of $285.90, as statutory compensation, in excess of the sum claimed therefor in the final account, thus reducing the sum reported on hand to $9,289.71, in addition to which he was charged with the sum of $7,561.69, and allowed only $75 of the sum demanded for probating the will and for preparing the final account, thereby requiring him to account for and pay to the legatees $16,926.40. The claim for extra compensation, attorney's fees for resisting the objections, office rent, etc., was denied.

From this order and from such parts of the decree as required an accounting for any sum in excess of that reported for distribution, the executor alone appealed to the circuit court for that county, where the cause was tried on a transcript of the testimony given in the county court, from which evidence findings of fact and of law were made; and, based thereon, the decision appealed from was affirmed as to the rejection of the executor's claim for extra compensation, special services performed, office rent and attorney's fees for opposing the objections, and also the allowance of $285.90 for his commission, in excess of the amount claimed therefor, thus reducing the sum reported on hand for distribution, as found by the county court, to $9,289.71, in addition to which it was decreed that Humphrey should be charged with a payment claimed to have been made June 16, 1903, to George H. Roach, of $75 and interest thereon, amounting to $83.21, with money improperly credited to H. E. Pike, $239.53, and to Mrs. M. E. Allen, $450, with losses sustained by reason of loans made on inadequate security, together with interest, attorney's fees, costs and disbursements incurred on account thereof, the makers of the promissory notes, evidencing the money borrowed, and the sums due from each thereon, being as follows: George P. Lent $2,092.69; L. M. Cox and James P. Shaw $3,094.62; and L. Hughes $1,-150.50; with squandering occasioned by purchasing the unsecured promissory notes of Willis Thorp $5,206.25; and with

o

injury incurred by purchasing certain lots in Mount Tabor Villa, and in the management of such property, $737.91—thus requiring the executor to account for the sum of $22,344.22, with interest thereon at the legal rate until paid. Humphrey was also ordered to convey and assign to the legatees certain real property, promissory notes and shares of stock, and it was decreed that upon the payment to each of them of one-third of the sum for which he was required to account and a compliance with the other parts of the decree he was to be discharged and his bondsmen exonerated. He was allowed the sums claimed as attorney's fees for probating the will and for preparing the final account. The executor appeals to this court from all parts of the decree that require him to account for a greater sum of money than he reported on hand for distribution, and from the disallowance of his claim for extra compensation, attorney's fees for controverting the objections, etc. The legatees also appeal from the rejection of other sums of money, for the payment of which they insist the executor is personally liable; from the allowance of his commission of $955.20, and from the award of his attorney's fees in the sum of $150.

MODIFIED.

For appellant there was a brief over the names of *Beach & Simon* and *Clinton C. Palmer,* with oral arguments by *Mr. Jarvis Varnal Beach* and *Mr. Palmer.*

For respondents there was a brief with an oral argument by *Mr. Hayward Hamilton Riddell.*

Opinion by MR. JUSTICE MOORE.

It is contended by Humphrey's counsel that the clauses of the will quoted imposed upon their client executorial duties upon the performance of which he became a trustee, and that, having fully discharged the first obligation, as is evidenced by his semiannual report of October 14, 1895, a trust in the property of the estate immediately attached, whereby the jurisdiction of the county court terminated and that of the circuit court attached; and, this being so, the former court was power-

less to act in the matter, and hence an error was committed in refusing to dismiss the proceedings.

Our statute prescribes the time and order of payment of charges and claims against a decedent's estate (B. & C. Comp. § 1212), upon the discharge of which the legatees are to be paid and the remaining proceeds of the personal property distributed among the heirs or other persons entitled thereto: B. & C. Comp. § 1220. This enactment would seem to make it incumbent upon the personal representative of the decedent to settle the estate committed to him within a reasonable time after assuming charge thereof, and it would also appear that when, by the terms of a last will, an executor is required to carry out the direction of a testator, the performance of which cannot reasonably be accomplished within the time implied from the statute, a trust is thereby imposed.

1. However this may be, in a general sense every executor is a trustee for the legatees and the next of kin (Willard, Executors, 36), and it will be assumed, without deciding the question, that the will under consideration required Humphrey, after paying the debts of the estate and the bequests that had matured, to perform the duties pertaining to a testamentary trustee.

2. In the discharge of such a trust the county court, as a probate tribunal, had no control, but the circuit court, as a court of equity, alone had jurisdiction of the subject-matter.

3. When a person has been appointed by a testator to execute the bequests of a will, and also vested by such testament with an interest in or a power over the property which, after the testator's death, he is to perform for the benefit or to the use of another, the relation of the person so appointed to the estate, when legally committed to him, must, upon principle, be the same as if a branch of the duty were delegated to one person as executor and the remaining part to another as trustee. In the case supposed, a moment's reflection would seem to induce the conclusion that, when an executor lawfully secures possession of the property of a decedent's estate, any inter-

meddling therewith by a testamentary trustee, until the exec-
utor has been discharged, would be regarded by the probate
court as the usurpation of its authority, for, as the testator's
debts, funeral expenses, etc., must be paid before any trust
can attach to the property, under a devise or bequest thereof,
the jurisdiction of such court necessarily precedes that of an
equity tribunal, and is therefore exclusive.

4. When the same person has been appointed by a will to ·
perform such dual duty in respect to the property of an estate,
no service is demanded of him as testamentary trustee until he
has fully performed his executorial obligation and secured an
order of the probate court discharging him and liberating his
bondsmen. Thus in *Prindle* v. *Holcomb,* 45 Conn. 111, it was
held that the probate records should show that an executor's
account had been settled, before a testamentary trustee was
entitled to take and hold the property of the estate for the pur-
poses of the trust. In *White* v. *Ditson,* 140 Mass. 351 (4 N. E
606: 54 Am. Rep. 473), in speaking of an executor, the court
say: "While Healy fully completed the administration of the
estate by the payment of all the debts, legacies and expenses,
he settled no final account as executor, and did not, by any
open, notorious act, discharge himself as such in the probate
court by assuming to transfer the residue of the property to
himself·as trustee, or by any other act indicating an intention
thereafter to hold the same for the purposes of the trust. * *
As actual payment cannot be made by one to himself, it has
been held that, where the same person is executor and trustee,
he must give bond in his character of trustee before he can
exonerate himself from his liability as executor."

5. In the case at bar, it does not appear that Humphrey gave
a new undertaking as trustee. He did not secure an order of
the county court, discharging him as executor; nor did he do
anything from which it can reasonably be inferred that he
intended to change his relation to the property, except in fail-
ing to file semiannual reports of the receipt and disbursement
of money, until compelled to render a final account. Such neg-
lect, however, is ineffectual to change his executorial relation,

and his duty to the estate and the rule of law by which he should be governed is tersely stated in the case of *Bellinger* v. *Thompson,* 26 Or. 320 (37 Pac. 714, 40 Pac. 229), where Mr. Chief Justice BEAN, in speaking of another executor, observes: "It may be that the will gave him two characters, those of an executor and trustee, but the duties of the one are separate and distinct from and independent of the other; and until he was discharged from the former and assumed the duties of the latter, his liability as executor still continued." In support of the legal principle thus announced, see, also, 18 Cyc. 1112; 1 Woerner, Am. Law Admr. (2 ed.) 346; *Dougherty* v. *Bartlett,* 100 Cal. 496 (35 Pac. 431); *Prior* v. *Talbot,* 10 Cush. 1; *Cruce* v. *Cruce,* 81 Mo. 676; *Foster* ·v. *Wise,* 46 Ohio St. 20 (16 N. E. 687: 15 Am. St. Rep. 542); *Wallber* v. *Wilmanns,* 116 Wis. 246 (93 N. W. 47).

The only adjudication which we have found that at all seems to controvert the rule thus proclaimed, and that does not involve the power of a probate court to compel the filing of a final account, is *Vohmann* v. *Michel,* 109 App. Div. 659 (96 N. Y. Supp. 309), where it was held that when a testatrix devised her residuary estate to trustees, as such, who were also executors, a loan made by them of a part of the residuary estate, secured by a mortgage, was not an executorial performance, but the act of trustees, though they had not, at the time of the loan, accounted as executors, or been discharged as such, or formerly transferred the property of the estate to themselves as trustees. The effect of that decision, however, is very much weakened by a modification of the decree on appeal, where the conclusion ultimately reached was placed on other grounds: *Vohmann* v. *Michel,* 185 N. Y. 420 (78 N. E. 156: 113 Am. St. Rep. 921).

6. The jurisdiction of the county court of Multnomah County was admitted when Humphrey secured from it a confirmation of his nomination as executor. Its authority was recognized when he made to it his semiannual reports, and, as nothing has ever been done by him to defeat the right of that court to hear and determine the matter, it was empowered to

compel a final settlement of the estate, and no error was committed in refusing to dismiss the proceedings: *In re Osburn's Estate,* 36 Or. 8 (58 Pac. 521: 5 Prob. Rep. Ann. 148).

7. It will be remembered that the county court awarded the legatees $16,926.40, and that the circuit court gave them $22,-344.22. As the executor alone appealed from such parts of the decree of the county court as required him to account for a greater sum of money than he reported on hand for distribution, his counsel maintain that the power of the circuit court was limited to the adjudication made by the county court, and that, in decreeing the recovery of a greater sum, an error was committed. The statute regulating the manner of reviewing the final determinations of a court, so far as thought to be important herein, is as follows:

"Upon an appeal from the judgment of a county court * * the action shall be tried anew, upon substantially the issues tried in the court below": B. & C. Comp, § 555.

"Upon an appeal, the appellate court may affirm, reverse or modify the judgment or decree appealed from, in the respect mentioned in the notice, and not otherwise * * and may, if necessary and proper, order a new trial": B. & C. Comp, § 556.

"Upon an appeal to the circuit court, the manner of proceeding thereafter is the same as if the action or suit had been commenced in such court; but if the appeal be from a decree of the county court, the appellate court may give a final decree in the cause or matter, to be enforced as a decree of such court, or such decree as may be proper, and direct that the cause or matter be remitted to the court below for further proceedings in accordance therewith": B. & C. Comp, § 558, subd. 3.

In construing these provisions, it has been held that final decrees of circuit courts were to be modified only in the manner specified in the notice of appeal, and that, when no cross-appeal is taken, it will be presumed that the respondent is satisfied with the determination of the cause, as made by the court below: *Shook* v. *Colohan,* 12 Or. 239 (6 Pac. 503) ; *Portland Construction Co.* v. *O'Neil,* 24 Or. 54 (32 Pac. 764) ; *Smith* v. *Wilkins,* 38 Or. 583 (64 Pac. 760). Though the mode of procedure in probate practice is declared to be in the nature

of a suit in equity, as distinguished from an action at law (B. & C. Comp. § 1100), we do not think the rule which has been applied in this court in cases of appeals from parts of decrees given in circuit courts governs appeals from final decisions rendered by county courts, in matters pertaining to the settlement of decedents' estates. The county court is not technically a court of equity, but the proceedings had therein, in the administration upon estates, are analogous to the practice in courts of chancery: *Richardson's Guardianship,* 39 Or. 246 (64 Pac. 390) ; *Rutenic* v. *Hamakar,* 40 Or. 444 (67 Pac. 196). Interpreting, *in pari materia,* the sections of the statute quoted, the power to modify a decree appealed from, "in the respect mentioned in the notice, and not otherwise," is limited in our opinion to this court, and does not apply to cases on appeal from the final determinations of a county court in probate matters, a transfer of which removes the entire cause to the circuit court, where it is tried as if it had been originally instituted therein, except that the review is confined to an examination of the transcript sent up. The power to order a new trial does not exist in cases of appeal from the decrees of the county court in probate matters (*Plunkett's Estate,* 33 Or. 414: 54 Pac. 152), and, as the practice in reviewing such decrees is not the same as on appeal from the final determinations of the circuit court, no error was committed as alleged.

8. It is maintained by Humphrey's counsel that the circuit court erred in requiring the executor to account for sums of money to which no objections were made, and on grounds other than those stated in the exceptions. When, in administering upon a decedent's estate, a final account is filed, a day must be appointed for hearing objections thereto and for the settlement thereof: B. & C. Comp. § 1202. Any person interested in the estate may, on or before the day so designated, file his objections to the final account or to any item thereof, "specifying the particulars of such objections": B. & C. Comp. § 1203. The requirement which the statute thus imposes to indicate the precise exceptions relied upon was evidently designed, in the

system of pleading, as an answer, controverting the statement of facts contained in the final account, which is treated as a complaint, and such objections are apparently intended to impart notice to the personal representative of the decedent, so as to enable him to prepare for a trial of the issues thus framed: 18 Cyc. 1172; *Elder* v. *Whittemore,* 51 Ill. App. 662; *Succession of Bofenschen,* 29 La. Ann. 711. The court's examination of the facts challenged by the exception is therefore limited to the particular specification set forth in the objections interposed. In conformity with this rule, the items of the final account that are contested will be examined.

9. The objection to the credit of $75, claimed as money given to George H. Roach, June 16, 1903, is based on the ground that no such payment was ever made. The person to whom the money is asserted to have been delivered testified that he never received it, while the executor declared under oath that, though this credit was entered on his books, he was unable to find any receipt therefor, and that he had no personal recollection of the matter. The court properly disallowed the sum so claimed to have been paid.

10. In the prayer, which forms a part of the objections, in referring to this item, it is asked that the executor be required to account for $75. No declaration is made in the exception of any sum being due as compensation for the use of money on account of this item, and in allowing $8.21 as interest thereon an error was committed, necessitating a modification of the decree by remitting the sum last named.

11. The items noted in the final report:

"Henry E. Pike, on account of loan, $239.53," and

"Mrs. M. E. Allen, not on previous acct., $450," are not challenged in any manner, and the rejection thereof from the credit side of the account was erroneous, necessitating a further correction of the decree in these particulars.

12. The objections state that, without any order from the county court, Humphrey lent money to persons who, as evi-

dence thereof, executed promissory notes which were inadequately secured by mortgages of real property. In the investment of trust funds, though an executor is not an insurer, he is nevertheless required to exercise that degree of care and discretion which an intelligent person of ordinary prudence and judgment would observe in the management of his own affairs: 11 Am. & Eng. Enc. Law (2 ed.), 944; 7 Current Law, 1445; 18 Cyc. 233. "In lending money on mortgage of real estate, a degree of care is necessary, which, if omitted," says a learned author, "will render the executor liable personally": 2 Woerner, Am. Law Admr. (2 ed.), 709. In *Bogart* v. *Van Velsor,* 4 Edw. Ch. 718, it was ruled that, when an executor loans funds on real estate, he must use care as to the title, and ascertain that the value of the premises mortgaged is such as will, in all probability, be adequate security for repayment whenever the money shall be called in. In rendering that decision, Mr. Justice McCoun says: "The criterion of value in such cases is the opinion or estimate of men of ordinary prudence who would deem it safe to make a loan of the like amount of their own money on the same property." In *Clark* v. *Anderson,* 13 Bush, 111, it was held that a trustee was not chargeable with a loss resulting from a loan which was secured by a mortgage on real estate of cash value 50 per cent greater than the sum loaned, when the loss was caused by an unexpected depreciation of the worth of the property after the loan was made and which was occasioned by a financial crisis. In *Perrine* v. *Vreeland,* 33 N. J. Eq. 102, an executor loaned money, taking as security therefor a mortgage on unimproved city lots, worth at the time of the loan more than three times the amount of the fund; and it was determined that he was not personally liable for any loss that might result from his purchasing the property under a decree of foreclosure. In *Wilson* v. *Staats,* 33 N. J. Eq. 524, an executor having taken a first mortgage on a farm to secure a loan equivalent to two-thirds of the value of the land, it was held that he was not answerable for any loss that subsequently accrued. F. S. Akin, a witness for the

legatees, testified that he had been engaged in lending money and taking real estate mortgages as security therefor, and that a prudent person would not place on such property more than 50 per cent of the sum of money which could reasonably be obtained at a voluntary sale of the land for cash.

13. Applying the rule which is to be derived from the decisions on this branch of the case, and from the opinion of an expert witness in such matters, it appears that the executor on October 26, 1893, loaned one George P. Lent $1,000, taking as security therefor a mortgage of 160 acres of unimproved land, situated on the Clackamas River, about five miles east of Oregon City; that on May 28, 1894, Humphrey made another loan to Lent of a like sum, secured by a mortgage of 80 acres of timber land, situated about 40 miles east of the other tract. The promissory notes evidencing the loans not having been paid at maturity, the mortgages were foreclosed, and at a sale of the premises under the decrees the executor became the purchaser and secured deeds of the premises. He sold the 80 acres June 22, 1903, for $500, and on October 7th of that year he sold the 160-acre tract for $1,350, paying a commission of $100 to an agent for securing a purchaser of the latter premises, and three days thereafter, in consideration of $150, the executor entered satisfaction of the deficiency judgment rendered against the mortgagor. The circuit court found that at the time these loans were made the value of the 160 acres did not exceed $800, and that the worth of the 80 acres was not more than $120. The executor was charged with the sums so loaned and interest thereon at 8 per cent per annum until October 14, 1898, when the rate was changed to 6 per cent (Laws 1898, p. 15), and continued thereafter at the latter rate. He was also charged with attorney's fees and other expenses incurred in the foreclosure proceedings, and credited with the interest paid and money received from the sale of the land and on account of the judgment, whereby there remained due $2,092.69. The commission paid for securing a purchaser was not taken into consideration, and only $1,250,

50 OR. —— 13

the sum realized upon a sale of the 160 acres, was credited to the executor's account as to the larger tract of land.    Lent testified, as a witness for the executor, that he considered the loan on the 160 acres perfectly safe, and the other loan reasonably good.    It is not deemed necessary to set out in detail the testimony of the witnesses as to the values of the respective tracts of land referred to, for a careful perusal of the evidence convinces us that the finding of the circuit court in relation thereto is correct.    Lent stated what he considered the land to be worth, but his opinion is not the best evidence, for it must be kept in mind that he was the borrower, and, as it will be assumed that he was honest, he necessarily entertained an opinion that the land mortgaged afforded adequate security, and, though he was a competent witness, he was not disinterested.

14. .Whenever an executor's final account is properly challenged, the burden of proving the truth of the item or the reasonableness of any credit thus objected to devolves upon him.

15. Humphrey did not call an impartial witness to state that, Humphrey did not call an impartial witness to state that, in his opinion, a prudent man of discretion and judgment would, in the management of his own affairs, have loaned such sums of money on unimproved land so remote from market, 160 acres of which, as appears from the testimony, had very little saw timber thereon, and the remaining 80 acres contained trees that were fit only for piling.    The failure of the executor to introduce testimony as to the criterion of value and the method of determining it, as prescribed in the case of *Bogart* v. *Van Velsor,* 4 Edw. Ch. 718, was probably due to the fact that he could not find a qualified, unbiased witness who would have considered the loans safe investments.    Humphrey did not, in our opinion, meet the requirement which the rule of *onus probandi* thus imposed upon him by offering only Lent's testimony, as to the value of the land, each tract of which was inadequate security for the money loaned thereon.    The sum demanded in the objections on account of the loss resulting from the money loaned to Lent, on both tracts, is $2,004.20.    The decree re-

quires the executor to account for $2,092.69, or $88.49 more than is claimed by the legatees, and hence a modification must be made by remitting the sum last named.

16. L. M. Cox and James P. Shaw purchased lots 1 and 2 in block 60 of Caruthers' Addition to Caruthers' Addition to the City of Portland, agreeing to give therefor $5,000, of which sum they paid two-thirds, the remainder of the purchase price being evidenced by promissory notes secured by a mortgage of the premises. Humphrey, on February 11, 1893, procured an assignment of one of these notes, given for $833.33, and on October 17, 1895, he obtained a transfer of the other note, evidencing a consideration of $847. These negotiable instruments not having been paid, the mortgage was foreclosed, and the premises sold to the executor for $2,000, thereby leaving a deficiency judgment of $514.95, which sum included attorney's fees, costs, etc. The circuit court found that the lots specified are situated in a ravine, about 80 feet below the grade of the street, and that at the time the notes were assigned to the executor the mortgaged premises were of no greater value than $500, and computing the sum due, as hereinbefore indicated, it was decreed that the executor should account for the sum of $3,094.62 by reason of the loss sustained from accepting the inadequate security. Cox and Shaw, the mortgagors, as witnesses for the executor, severally testified that, when they purchased the property, they considered it worth the sum of money which they agreed to pay for it; that on February 11, 1893, the time when Humphrey secured an assignment of the first note, no depreciation in the value of real property in the City of Portland had occurred, but in June of that year the worth of all such lots began to grow less, in consequence of a great financial depression. These lots at the time they were purchased by the mortgagors evidently had a speculative value, but, being unimproved and owing to their situation, they had no real worth as a basis for security; and we think the court's finding in relation thereto is supported by the great weight of testimony. The witnesses for the legatees severally stated on

oath that this property was of but very little value, and the executor did not call any unbiased witness of experience and judgment to express an opinion as to what sum of his own money, if any, a reasonably prudent man would have loaned on two unoccupied city lots, situated in a canyon, which the testimony shows to be about a mile from the center of business of the city, and where the improvement of the highway upon which the lots abut, would, in all probability, many times exhaust the value of the property by the assessments imposed thereon. It will be remembered that the prices of all real property in the City of Portland had commenced declining when the executor obtained an assignment of the second note, in view of which and of the circumstances referred to in connection herewith no error was committed in requiring him to account for the sum found to be due.

17. Humphrey on May 15, 1894, loaned L. Hughes $600, taking as security therefor a second mortgage on lot 1 in block 6 in Paradise Spring Tract, Multnomah County, and also on 10 acres in section 7 in township 1 N. of range 2 E. of the Willamette Meridian, which latter tract is situated in a marsh. The executor on June 11, 1895, lent Hughes the further sum of $54.35, which was not secured in any manner. The first mortgage on the Paradise Spring Tract was foreclosed, and the lien of the second mortgage was extinguished thereby, without returning to the executor any part of the sum for which the premises were sold under the decree. Humphrey evidently thought the marsh land valueless, for, without attempting to foreclose the mortgage thereon, he permitted 10 years to elapse after the last payment was made on the debt intended to be secured. The court found that the estate lost by this transaction $1,150.30, for which sum the executor was required to account. If a loss occurs by reason of an executor's taking a second mortgage on real property as security for a loan, made for that purpose, he is liable therefor: *Wilson* v. *Staats,* 33 N. J. Eq. 524; *Crane* v. *Howell,* 35 N. J. Eq. 374.

18. No testimony was offered by either party to show the

value of the 10-acre tract, but, as the burden of proving the adequacy of the security, which was controverted, devolved upon the executor, any failure in this respect is attributable to him.

19. So, too, it was incumbent upon him to have foreclosed the lien of the mortgage on the marsh land, if he considered the premises valuable, but, having failed to institute a suit for that purpose and allowed the statute of limitations to bar a recovery, he is personally liable for the loss which resulted from his culpable negligence: 2 Woerner, Am. Law Admr. (2 ed.), 677.

20. The sum of $54.35, which the executor lent Hughes, though entered as an item of credit in the semiannual report of October 14, 1895, was not disputed by any objection. An error was therefore committed in requiring the executor to account for such sum and the interest thereon, amounting to $90.30, thereby necessitating a modification of the decree in this particular.

21. Humphrey obtained an assignment of two unsecured promissory notes, June 11, 1895, executed by one Willis Thorp, each for the sum of $1,250, and, only a small payment having been made on account of interest, a judgment was secured against the maker for the amount due, whereby the estate lost, including interest, attorney's fees, costs, expenses, etc., $5,-206.25, as found by the circuit court, for which sum it was decreed that the executor should account. The objection to this item is based on the ground that the executor is personally liable for any loss resulting from the loan of money of the estate without any security, and the sum demanded from him on account thereof is $3,715.40. We have no statute regulating the management of trust funds, except when they are in the custody of a guardian (B. & C. Comp. § 5278), or where the sale of personal property of an estate is ordered by the county court to be made on credit (B. & C. Comp. § 1169), or in case of the sale of real estate when time is allowed for the payment of a part of the purchase price, by taking a mortgage as secur-

ity therefor upon the real property sold (B. & C. Comp. § 1177). "In the absence of statutory provisions touching the method of investment, executors and administrators," says a text-writer, "are bound to employ, in the investment of the funds of the estate, such prudence and diligence as, in general, prudent men of discretion and intelligence employ in their own affairs": 2 Woerner, Am. Law Admr. (2. ed.), 707.

In *Gray* v. *Fox*, 1 N. J. Eq. 259 (22 Am. Dec. 508), in discussing the duty demanded in the management of trust funds and in stating the origin of the legal principle applicable thereto Chancellor Vroom says: "It is, well settled in English chancery, that, if trustees loan money without due security, they are liable in case of loss by insolvency. This is a safe rule, and the court has no hesitation in adopting it. The duties of trustees are very important, especially when the rights of infants are concerned, and it will always be the pleasure of the court to protect them, so far as it may be done consistently with safety and sound policy. Safety demands that the conduct of trustees should be watched with scrupulous care. Sound policy requires that the faithful steward should not be entrapped and ruined with technicalities and forms. The rule above stated, however valuable as a general principle for the government of the court, is not sufficiently definite to be of much practical use. We must go further, and inquire what is due security for moneys loaned by a trustee. Can the court adopt a general rule, or must each case be left to be decided on its own peculiar circumstances?" After calling attention to several decisions rendered in Great Britain on this subject, it is observed: "The principle to be extracted from these authorities is that the loaning of trust money, and especially where infants are concerned, on private security, is not a compliance with the rule that requires due security to be taken, and, of course, that such loans are made at the risk of the trustee." Further in the opinion the chancellor remarks: "I am not able to ascertain that the English rule has ever been adopted in this court, and I should feel some hesitancy in adopting it to

the extent to which it is carried in their courts.  The situation of the two countries differs very materially in many respects, and especially as it regards the policy of investments; and what may be a prudent rule of policy in one country may not be in another.  In England, property can always be invested in funds.  These are recognized by their courts as safe and permanent securities, and it is the policy of every branch of the government to consider them so.  In this country, the amount of public or government stock is very small, and in an inland state like our own there are few opportunities for investing in that kind of security.  The stock of private corporations is not considered safe, and investments in that species of stock would scarcely be encouraged by a court of equity.  There is, then, no other but landed security that would come within this rule.  This can most generally be attained, and the court would advise it to be taken in all cases where public stock cannot be procured."

The rule thus announced is firmly established in the state in which it was so promulgated (*Vreeland* v. *Vreeland's Adm'r,* 16 N. J. Eq. 512; *Tucker* v. *Tucker,* 33 N. J. Eq. 235; *Dufford's Ex'r* v. *Smith,* 46 N. J. Eq. 216: 18 Atl. 1052), and, as the legal principle declared is so consonant with reason in dealing with the property of infants, an extensive quotation has been made from the opinion in the leading case.  The loss of trust funds in consequence of an omission to take adequate security is negligence, and an executor is personally liable for a failure to obtain a repayment of money of the estate lent without any security, whether or not the loan was made before or after the passage of an act prescribing the manner of investing funds by a trustee: *Judge of Probate* v. *Mathes,* 60 N. H. 433.  See, also, on this subject, 2 Woerner, Am. Law Admr. (2 ed.), 708.  Mrs. Roach not having directed in her will the manner of loaning the money of which she might die possessed, the executor is liable personally for that part of the loss occasioned by the purchase of the unsecured promissory notes of Thorp that is properly challenged.

22. The decree requiring the executor, in the settlement of his final report, to account for the sums so found to be due the estate, must necessarily be based upon the allegations and proof.

23. The legatees were not limited to their original objections, but they could have filed additional or amended exceptions at any stage of the proceedings to modify or enlarge their demand so as to make it correspond with the testimony produced (*In re Meeker's Estate,* 45 Mo. App. 186), but, not having done so, the decree must be changed so as to agree with the claim for $3,715.40, thereby rendering a remission of $1,490.85 unavoidable.

24. The transcript discloses that John H. Rathburn and his wife gave to J. Mosher their promissory note for $800, and to secure the payment thereof they executed to him a mortgage upon certain lots in Mount Tabor Villa, Multnomah County. This note was assigned to Humphrey, but the mortgage was thereafter foreclosed by Mosher, and, on a sale of the premises under the decree, the executor became the purchaser thereof, and on November 20, 1903, he conveyed the lots to T. S. McDaniel for $900, but prior thereto Humphrey received payments for the rent of buildings on the land. Several objections to this transaction having been interposed, the circuit court charged the executor with the sum paid Mosher for an assignment of the Rathburn note, the interest thereon, the taxes paid, and all other expenses incurred on account of the property, and credited him with the sum received on a resale of the lots and the amount obtained for rent, and found that there was due from him to the estate the sum of $737.91, for which he was required to account. At the trial in the county court the executor's counsel stated that the sale of these lots was apparently made to Humphrey in his own name, and for that reason he should probably be charged with the money expended therefor, $904, and interest thereon, and offered a settlement of the item on that basis. The counsel for the legatees refused to accept the tender, however, insisting that a greater sum was due from

the executor than would accrue by the system of computation suggested. The circuit court apparently adopted the proposition, and, having done so, its conclusion is within the demand and compatible with the solemn admissions of the executor's counsel made in open court, and hence the sum so found to be due will not be disturbed.

25. Humphrey's claim for extra compensation, attorney's fees, rent, special services performed, etc., having been denied, except as to the allowance of $150 for probating the will and for preparing the final account, it is insisted that an error was thereby committed. Though the circuit court found that an office for the transaction of the business of the estate was not necessary, and that Humphrey had not performed any unusual or extraordinary services, and therefore his claim on account of the items last specified was denied, he was allowed the sum of $955.20, compensation prescribed by law for discharging the duty devolving upon him. The accounts filed in the county court show that Humphrey claimed credits, amounting to $2,258, for money expended on account of attorney's fees. The several sums to such agents, who were appointed by the executor and authorized to act for him, paid in securing judgments against the following named parties, were disapproved, to wit: George P. Lent $225; Willis Thorp $657; L. M. Cox and James P. Shaw $176; L. Hughes $25; and John H. Rathburn $75—amounting to $1,158, thereby allowing on account of attorney's fees $1,100. It will be remembered that the circuit court granted the executor as attorney's fees for probating the will $50, and for preparing the final account $100, but no part of the sum was deducted from the award, in consequence of which the decree appealed from must be further modified to the extent of such allowance. The executor never applied to the county court for advice or direction as to the manner of loaning the money of the estate, and for more than eight years he made no report to such court of his dealings with the property in his possession, though required by statute to account therefor semiannually: B. & C. Comp. § 1199. The law im-

posed upon him a duty in this respect, a breach of which is sufficient ground for denying him any extra compensation, office rent, or attorney's fees (11 Am. & Eng. Ency. Law (2 ed.), 1282), and by reason of such neglect his claim was properly rejected: *In re Estate of Holbert,* 48 Cal. 627.

26. The legatees appeal from that part of the decree which fails to require the executor to account to them for certain other loans of money of the estate on unsecured promissory notes whereby losses were sustained. Their objections do not assign the grounds now insisted upon, and hence no error was committed in denying the relief sought.

27. They also appeal from the order of the circuit court allowing Humphrey the compensation prescribed by statute, from the allowance of $150, as attorney's fees, and from certain other items of credit granted him; but, believing that no errors were committed in these respects, the decree will be modified as hereinbefore indicated, by deducting from $22,344.22, the sum for which the executor was required to account, as follows: Interest on money claimed to have been paid to George H. Roach $8.21; the accounts of H. E. Pike $239.53, and of Mrs. M. E. Allen $450; the excess on account of loans made to George P. Lent $88.49; L. Hughes, $90.30; Willis Thorp, $1,490.85, and attorney's fees $150, not considered by the circuit court in its computation—making in all $2,517.38, thus requiring the executor to account for $19,826.84, with interest thereon at the rate of 6 per cent per annum from July 20, 1905, the day when the decree was rendered in the court below, and upon the payment to each of the legatees of one-third of that sum, and the performance of the conditions hereinafter specified, the executor will be discharged and his bondsmen exonerated. As a condition precedent to such payment, however, the legatees will be required to execute to Humphrey quitclaim deeds of all their right, interest or claim in or to any of the real property the title to which was secured for the estate upon the foreclosure of mortgages and sales thereunder, where the transactions have been hereinbefore disapproved,

to wit: Lots 1 and 2 in block 60, in Caruthers' Addition to Caruthers' Addition to the City of Portland, and also to assign to him any interest they may have in the deficiency judgment against L. M. Cox and James P. Shaw, the judgment rendered against Willis Thorp, and also to transfer to Humphrey any interest they may have in the promissory note of L. Hughes. Humphrey will be required to transfer to the legatees, as tenants in common, the shares of stock specified in the inventory, the deficiency judgment against the following named parties, to wit: J. V. Allen, and I. A. and C. L. Roper, Carrie C. Covey, and T. M. Rankin. And also to assign to them promissory notes executed by the following named persons: L. O. and A. M. Nelson, Edgar W. and J. K. Phillips, Catherine and P. L. Weiser, John and Lizzie Foster, W. O. Allen, C. M. Wiberg, and Frank Morgan and Angus Campbell.

28. The transcript shows that Humphrey in satisfaction of mortgage debts accepted conveyances of the incumbered land, and also foreclosed mortgages, and, on the sale of the real property effected thereby, took deeds therefor made to himself as executor, etc., and, in order that any right, title or interest he may have in such premises may be transferred, he will, as a condition precedent to his discharge and the liberation of his bondsmen, be required to execute to the legatees, as tenants in common, quitclaim deeds of the following described real property, to wit: Lots 3, 4 and 5, in block 13, in Southern Portland; lots H and I in Washington Addition to East Portland (now incorporated in the City of Portland), all in Multnomah County, State of Oregon; and also lots 10 and 11, in block 9, and lots 12 and 13, in block 28 in Frasier and Hyland's Addition to the City of Eugene, in Lane County, Oregon. We do not think it necessary to discuss, at this time, the question whether or not this court, in reviewing the action of a county court, in probate matters, can order a party to execute a deed to real property and to provide that, upon a failure or refusal to comply therewith, the decree shall operate as and for a conveyance of the premises; but we entertain no doubt of the

power of the county court, and hence of this court, to require the parties, as a condition precedent to the relief granted and of the accounting enjoined, to impose the burdens hereinbefore specified in respect to executing the deeds mentioned.

The decree appealed from will therefore be modified in the particulars indicated, but in all other respects affirmed, and the cause will be sent back to the circuit court to be remitted to the county court of Multnomah County, with directions to enter a decree therein as hereinbefore specified.

29. The executor will be allowed his costs and disbursements incurred in this court.　　　　　　　　　　　　MODIFIED.